Filed 8/5/26  P. v. Bustamante CA4/1

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## COURT OF APPEAL, FOURTH APPELLATE DISTRICT

## DIVISION ONE

## STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>WILLIE BUSTAMANTE,<br><br>    Defendant and Appellant. | D085914<br><br><br>(Super. Ct. No. INF2301445) |

APPEAL from a judgment of the Superior Court of Riverside County, Timothy J. Hollenhorst, Judge.  Affirmed.

Ava R. Stralla, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Charles C. Ragland, Chief Assistant Attorney General, Arlene A. Sevidal, Assistant Attorney General, Eric A. Swenson and Tyler L. Krentz, Deputy Attorneys General, for Plaintiff and Respondent.

A jury found Willie Bustamante guilty of voluntary manslaughter and found true an allegation that he personally and intentionally used a firearm in the offense.  The trial court sentenced him to six years in prison, comprised of the low term of three years for the voluntary manslaughter conviction and an additional three years for the firearm enhancement.  Bustamante asserts there was insufficient evidence to support the conviction; that the trial court

erred by instructing the jury with CALCRIM Nos. 341 (mutual combat) and 342 (contrived self-defense); and that the trial court abused its discretion by failing to conclude that this was an unusual case in which the interests of justice would be served by granting Bustamante probation. We find no error and affirm the judgment.

## I. FACTUAL AND PROCEDURAL BACKGROUND

On August 6, 2023, Bustamante shot the victim, Ernesto Arroyo,[1] in the stomach during a fight at a restaurant/bar, causing his death. The People charged Bustamante with murder, and alleged that he personally and intentionally discharged a firearm and proximately caused Ernesto's death. Bustamante did not deny shooting Ernesto at trial but argued that Ernesto was the aggressor in the fight, and that he acted in self-defense. Several eyewitnesses gave varying accounts of the incident at trial, which we set forth below.

### A. Prosecution's Evidence

#### 1. Witnesses to the Altercation

##### a. Mia V.

Mia was at the restaurant with her mother, Melissa L., and her aunt on August 6, 2023. They sat at a high-top table near the bar. Mia noticed a man and woman (Ernesto and Stephanie) seated at the bar just across from them.[2] Ernesto and Stephanie were drinking but did not order any food. Ernesto appeared to be drunk and was being very loud. On two different

---

[1] We refer to Ernesto and various other witnesses by their first names to avoid confusion. No disrespect is intended.

[2] Mia did not know the couple seated at the bar but, as discussed, *post*, additional testimony established that it was Ernesto and Stephanie.

occasions, Ernesto yelled out something like, "I'm the daddy" while beating his chest.

There was another group of men[3] sitting at a table behind and to the left of Mia's table. Ernesto went over and sat down at the table with that group and they talked "for a few minutes."[4] He seemed "fine" when he returned to the bar. The group from the table then came back to the bar to say goodbye. It looked fine at first but then they all started fighting.

Prior to the fight, Mia saw one of the men from the table (Bustamante) with what looked like a stack of brown napkins. Bustamante passed the stack back and forth with Ernesto. As they passed the stack, they exchanged words, and Ernesto's face changed from happy and jovial to upset or angry. Ernesto threw a punch and then chaos erupted. Mike and Tony rushed in and tried to hold Ernesto back, but he kept getting free and chasing Bustamante. One of the men was able to restrain Ernesto for a while, but Stephanie started hitting the man in the head with her cell phone until he released Ernesto. Bustamante tried to go up a ramp in the restaurant but Ernesto followed him.

Mia picked up her phone and started recording. Mia's aunt said "gun," Mia saw the gun, and they all ran out of the restaurant, hearing a gunshot as they left. Mia was scared. Later, Mia spoke with the police and gave them the video she had recorded. The People played the video for the jury. Mia identified the man from the bar (Ernesto) as wearing a black tank top and the man from the table (Bustamante) as wearing a white shirt. She was less

---

[3]   Mia was uncertain if there were three or four men in the group.

[4]   Mia also did not know the individuals at the table, but other evidence establishes the group included Bustamante, Antonio P. (Tony), and Mike R.

certain of the other individuals.  She did not recognize or identify Bustamante in court.  In the video, a gun can be seen in Bustamante's right hand while Ernesto places him in a choke hold at the top of the ramp.

### b.    Joanna T.

Joanna was working at the restaurant as a hostess.  She greeted a group of three men[5] and seated them at a table at a level above the bar that was accessed via an ADA disability ramp.  Joanna also remembered the couple sitting at the bar and noted that they seemed loving and sociable towards one another.  The three men at the table (Bustamante, Tony, and Mike) gestured towards the couple at the bar (Ernesto and Stephanie), as if to say hello.  Ernesto went over to the table and had a friendly conversation with Bustamante, Tony, and Mike.

Later, Joanna noticed that the three men from the table got up and went over to the bar area.  They went over to Ernesto and started "viciously attacking him."  One of the men from the table grabbed Ernesto's shirt and punched him.  All three of the men from the table were punching and kicking Ernesto, and one punched Stephanie as well.  The attack went on "continuously nonstop" for several minutes and eventually moved from the bar onto the ADA disability ramp, where Ernesto "got shot point-blank."

Joanna was outside the restaurant when Ernesto got shot.  She heard a waitress yell, "He's got a gun," and ran outside, but still had a visual on the situation through the window.  She tried to call 911 but was unable to get reception.  She went back inside and saw the three men from the table leave the scene.

---

[5]    The same group identified by Mia.

### c. Ashley L.

Ashley worked as a to-go server at the restaurant. She was working in the kitchen when one of the servers came "running to the kitchen yelling out for our manager because there was a fight going on" in the dining area. Ashley walked out to the dining area with her phone in her hand and started recording. She recalled seeing one person (Bustamante) sitting on the ramp and several others standing nearby and then hearing the shooting. At that point, she went back into the kitchen. She never saw any punches being thrown or actual fighting but the video she recorded included at least one gunshot. The People played this video for the jury as well. Ashley said that she believed Bustamante was approximately three feet away from Ernesto when he fired the gun, but also stated that she was not very good at estimating distances.

### d. Stephanie Salazar

Stephanie Salazar was married to Ernesto. Stephanie and Ernesto were at the restaurant together on the evening of the shooting. The two of them had been going there about once a week for years and so they knew a lot of the regulars. They sat at the bar and drank vodka with soda water from about 8:00 to 11:30 p.m. The bill indicated that they purchased 11 drinks and an order of wings.

At one point, Ernesto got up and went to a table in the back corner of the restaurant where Bustamante was seated with Tony and another man that Stephanie did not know (Mike). Ernesto was at the table talking with the men for about an hour, while Stephanie talked to some other people at the bar. Ernesto came back to the bar and paid the bill because he and Stephanie were planning to leave. Stephanie said goodbye to someone at the bar and when she turned around, the three men from the table had surrounded Ernesto. Ernesto looked confused.

5

Tony grabbed Ernesto, and the third man that Stephanie did not know grabbed her. Ernesto and Bustamante were fighting. Tony was holding Ernesto while he got hit. Stephanie started hitting the men with her phone, trying to help Ernesto. Ernesto broke free from Tony and resumed fighting with Bustamante on the ADA ramp. Stephanie was angry at that point, because the men had attacked Ernesto. Then she heard a female say, "He's got a gun." According to Stephanie, the fight had ended, Ernesto was "over there with the manager, everybody was safe and separate." She then heard a noise and Ernesto said, "Baby, they shot me."

After reviewing Mia's video of the fight, Stephanie agreed that Bustamante had gone over by the ADA ramp and that, after Ernesto broke free from Tony, he went after and punched Bustamante. She said that after the video ended, Ernesto "got off [Bustamante] willingly." She did not know how Bustamante got on the ground.

The prosecutor then played Ashley's video. Stephanie said that she remembered that Bustamante was on the ground, and "that's when it stopped. Everybody was taking their corner. Ernesto was over there talking to a manager. It was over." Stephanie first estimated that there was five minutes between the end of Mia's video and the start of Ashley's, but then revised her opinion and stated that it was the length of Mia's video, about another 30 seconds, until the start of Ashley's.

Commander Nathaniel Hanley of the Cathedral City Police Department testified that Stephanie said that Ernesto got mad just before the fight, not that he looked confused, when he interviewed her after the shooting. She originally said the fight was still ongoing when the shots were fired, but when he interviewed her later, after viewing the video, she said it was not ongoing.

6

### e. Abel H.

Abel was a dishwasher at the restaurant. Someone came into the kitchen and said there was a fight happening, so Abel "decided to go take a look." When he walked out, the person in the white shirt (Bustamante) was seated on the ground. Abel was only there for a short period of time. He heard a gunshot and got scared and went back to the kitchen. He did not see who had a gun. Abel said that he did not have good eyesight and needed glasses but did not have any that day.

### f. Sergio A.

Sergio was also a dishwasher at the restaurant. One of the waitresses came into the kitchen "shouting saying that someone was being struck" and Sergio went out, along with his co-workers, to see what was happening. He saw two men beating on a third man that was "down below" on the floor. The person on the floor took out a weapon, charged it, and fired with his right hand. The person sitting on the ground had "a lot of blood" on his face from being kicked or punched. The other people on the ramp were struggling amongst each other, which allowed the man on the floor time to take out the gun from his waistline and fire it. Sergio recalled the man firing the gun up in the air. He did not see anyone get shot.

A detective testified that he interviewed Sergio on the scene. Sergio said that he was standing about 10 feet away from the ADA ramp. He saw three men surrounding a male subject that was sitting on the floor, and it appeared that everyone was backing away.

### 2. The Investigation

When law enforcement arrived on the scene, they found a male victim, Ernesto, lying on his back on an ADA ramp in the northeast portion of the dining area. Ernesto's wife, Stephanie, was lying on top of him, crying and saying that he got shot. The officer lifted Ernesto's shirt and located a bullet

7

hole in Ernesto's stomach. He rolled Ernesto to his side and observed an exit wound on his back. Ernesto had a pulse but he was not alert and his breathing was very labored.

The officer located a shell casing and two live rounds—bullets that had not been fired—on the floor. He also found pieces of a broken necklace on the ramp. The tables around the perimeter of the bar appeared to be pushed back and knocked around, and there were broken dishes near the tables. Another officer subsequently located a second spent bullet embedded in the wall.

The fire department transported Ernesto to the hospital in critical condition. Ernesto was pronounced dead at the hospital later that evening. A forensic pathologist performed an autopsy and determined that the gunshot wound to the stomach severed the iliac blood vessels, causing Ernesto's death. Ernesto had other injuries on his body, but they did not contribute to his death. He had a bruise on his right wrist but no significant injuries to his hands. He was 5'8" and weighed approximately 191 pounds at the time of his death.

Detective Charles Siqueiros spoke with Stephanie at the hospital. He noted that she was very emotional and heavily intoxicated. Siqueiros also took photographs of Ernesto's belongings. There was a switchblade knife with a four-inch blade in his pocket.

Detectives obtained the video from the incident and examined stills. They returned to the restaurant and determined that the railing on the ADA ramp where the shooting occurred was 14 feet, 3 inches in length.

Commander Nathaniel Hanley reviewed a still frame taken from Ashley's video just before the audible gun shot and noted that Bustamante was on the floor at the bottom of the ramp, near the first handrail anchor.

Stephanie and a man later identified as Mike were on the ramp between Bustamante and Ernesto. Mike and Stephanie each had a hand on the railing. Tony's arm was around Ernesto's bicep, seeming to hold Ernesto back. Commander Hanley estimated that there was about nine feet, six inches (and three individuals) between Bustamante and Ernesto. When he showed Stephanie this video, she said that the fight was not ongoing at that time.

Officers arrested Bustamante and conducted a search of his grandmother's house on August 7, 2024. They found a duffel bag containing men's clothing and baseball hats, as well as some receipts with Bustamante's name on them. They did not locate any firearms. Officers also searched the home where Bustamante lived with his wife, as well as Tony's house, and canvased the area around the crime scene. They never recovered the firearm used to shoot Ernesto.

The police downloaded the contents of Bustamante's cell phone. Bustamante sent a message just after midnight on the night of the shooting, stating, "I heard this bitch has foo cracked me, left me with a black eye. I'm left without you foos." Later, there was an incoming message that said, "You good, G?" and a response from Bustamante stating, "Naw. Some shit went down."

B.  **Defense Evidence and Witnesses**

1.  **Melissa L.**

The defense called Mia's mother, Melissa. Melissa did not know Ernesto before the shooting, but she noticed him when they walked into the restaurant that night. He was speaking louder than everyone else and stood out. It seemed like he knew everyone else in the restaurant. At some point, he went up the ramp to sit at a table with some other guys, behind Melissa and her group. Melissa did not notice anything that seemed like a

9

confrontation at the table.  When Ernesto returned to the bar, the woman he was with seemed irritated and Ernesto began to pay their bill.

As Ernesto and Stephanie were saying their goodbyes, Bustamante approached Ernesto.  At first, it did not seem like they were mad at each other.  Suddenly, Ernesto punched Bustamante in the face.  Ernesto continued to swing on, or punch, Bustamante.  Bustamante threw one, maybe two, punches but was not really trying to fight back.

One of the other men from the table came over and was holding Ernesto, trying to deescalate the situation.  Bustamante was trying to get away.  Stephanie started hitting people, trying to protect Ernesto.  Bustamante walked away and the fighting had stopped, but Stephanie was hitting Tony, who was holding Ernesto in a bear hug, on the head with her phone.  Tony let go of Ernesto and Ernesto ran after Bustamante.  They both punched Bustamante and Ernesto put him in a headlock, and "was like choking him out."

At that point, Melissa's cousin said that Bustamante had a gun.  Melissa began to run out of the restaurant but she heard the gun fire before she left.

### 2.    Lorenzo A.

Lorenzo was working as a cook at the restaurant on the night of the shooting.  A server came into the kitchen and said there was a fight so Lorenzo went to check on his partner, who was also working as a server.  He saw a person on the floor getting hit by two other people, a man and a woman.  Another person was standing on the ramp trying to stop the hitting.  The woman kicked the man that was on the floor twice in the face.  Lorenzo looked away and then heard a gunshot.  Right after the shooting, Lorenzo told the police that he saw Bustamante take out the gun, but at trial, he did not recall seeing the gun.

10

### 3. Kevin L.

Kevin was the general manager at the restaurant on the night of the shooting. He testified that there were surveillance cameras in the restaurant but that they were not working on August 6, 2023. He was not present for the shooting, but came in after to ensure the restaurant was cleaned and could be reopened. There were small blood splatters along the wall by the railing, but no significant amounts of blood.

### 4. Kevin Bailey

Kevin Bailey is a physician's assistant. He examined Bustamante on August 29, 2023. Bustamante stated that he had facial contusions and was concerned about a possible orbital fracture. Bustamante had some soft tissue swelling and tenderness. Bailey noted some shininess to Bustamante's skin, which could indicate healed or healing bruises. There were no fractures. However, Bustamante's injuries were consistent with being punched and kicked in the face.

### 5. Dr. Maisy Ibrahim

Dr. Ibrahim is a dentist. She saw Bustamante on September 11, 2023. Bustamante had severe TMJ issues (pain in the jaw joint and muscles). He could not open his mouth. His lower front teeth were loose and he had nerve damage on two teeth. He also had chips on his upper front teeth. Dr. Ibrahim determined Bustamante's lower teeth were loose because of recent trauma to a ligament. The injuries were "possibly" consistent with being punched or kicked in the mouth.

### 6. Tony Portillo

The defense also attempted to call Tony Portillo but he invoked his Fifth Amendment privilege.

11

## C. Verdict and Sentencing

The jury found Bustamante not guilty of first or second degree murder. They found him guilty of voluntary manslaughter, and found true an allegation that he personally and intentionally discharged a firearm and proximately caused great bodily injury or death. The trial court sentenced Bustamante to the low term of three years in prison on the voluntary manslaughter conviction, and an additional and consecutive three years based on the personal use of a firearm allegation, for a total combined sentence of six years in prison.

## II. DISCUSSION

Bustamante asserts there was insufficient evidence to support the conviction for voluntary manslaughter, and that the evidence instead establishes that he had a right to self-defense as a matter of law. In addition, he asserts there was not sufficient evidence to support instructing the jury with CALCRIM Nos. 3471 (mutual combat) or 3472 (contrived self-defense), and that the trial court abused its discretion in declining to sentence him to probation.

## A. Sufficient Evidence Supports the Voluntary Manslaughter Conviction

We begin with Bustamante's assertion that there was insufficient evidence to support the conviction for voluntary manslaughter.

We examine the entire record in the light most favorable to the judgment to determine if there is substantial evidence from which any reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. (*People v. Nelson* (2011) 51 Cal.4th 198, 210 (*Nelson*).) Because it is the exclusive province of the jury to determine credibility and to resolve evidentiary conflicts or inconsistencies, we presume the existence of every fact the jury could reasonably deduce from the evidence to support the

judgment.  (*Ibid.*; *People v. Young* (2005) 34 Cal.4th 1149, 1175, 1181.)  If the circumstances reasonably justify the jury's findings, reversal is not warranted merely because the circumstances might also be reasonably reconciled with a contrary finding.  (*Nelson*, at p. 210.)

Murder is the "unlawful killing of a human being . . . with malice aforethought."  (Pen. Code, § 187, subd. (a).)  A willful, deliberate and premeditated killing is first degree murder.  (Pen. Code, § 189, subd. (a).)

Self-defense is an affirmative defense, establishing justification for the defendant's conduct such that the conduct is not unlawful.  (*People v. Frye* (1992) 7 Cal.App.4th 1148, 1154.)  " 'For perfect self-defense, one must actually *and* reasonably believe in the necessity of defending oneself from imminent danger of death or great bodily injury.' "  (*People v. Lopez* (2011) 199 Cal.App.4th 1297, 1305.)  "The danger must be imminent; mere fear that it will become imminent is not enough."  (*Ibid.*)

Manslaughter is "the unlawful killing of a human being without malice."  (Pen. Code, § 192.)  A defendant lacks malice and is guilty of voluntary manslaughter when they kill another, acting with either the intent to kill or a conscious disregard for life, but in a sudden quarrel or heat of passion, or unreasonable self-defense.  (*People v. Blakeley* (2000) 23 Cal.4th 82, 89–91 (*Blakeley*); *People v. Lasko* (2000) 23 Cal.4th 101, 109–110.) " 'Because heat of passion and unreasonable self-defense reduce an intentional, unlawful killing from murder to voluntary manslaughter by *negating the element of malice* that *otherwise inheres* in such a homicide [citation], voluntary manslaughter of these two forms is considered a lesser necessarily included offense of intentional murder.' "  (*People v. Moye* (2009) 47 Cal.4th 537, 549 (*Moye*).)

13

Here, the trial court instructed the jury on murder, provocation, self-defense, and voluntary manslaughter. Bustamante asserts that the evidence establishes that he acted in self-defense as a matter of law. " ' "[W]here the evidence is uncontroverted and establishes all of the elements for a finding of self-defense it may be held as a matter of law that the killing was justified; however, where some of the evidence tends to show a situation in which a killing may not be justified then the issue is a question of fact for the jury to determine." ' " (*People v. Nguyen* (2015) 61 Cal.4th 1015, 1044.) Thus, despite Bustamante's phrasing of the argument, the issue we must address is whether there is sufficient evidence to support the jury's finding that Bustamante was guilty of voluntary manslaughter; and thus, that the killing was not justified by perfect self-defense.

Bustamante asserts that no rational jury could conclude, beyond a reasonable doubt, that a reasonable person in his position would not need to defend oneself. But in making this assertion, Bustamante asks this court to ignore the evidence that is not in his favor. This we cannot do. (See, *Nelson*, *supra*, 51 Cal.4th at p. 210.) Rather, we must view the evidence in the light most favorable to the verdict. (*Ibid*.) Doing so, we have no trouble concluding there was substantial evidence to convict Bustamante on the lesser included offense of voluntary manslaughter.

All the witnesses seemed to agree that the first conversation between Ernesto and the group at the table was friendly. Although Mia suggested that Ernesto threw the first punch, she also testified that both men appeared to be getting along until Bustamante approached Ernesto with the stack of napkins. In addition, Stephanie testified that she and Ernesto were planning to leave when Bustamante approached, and that he and the two other men from the table surrounded Ernesto, starting the fight.

14

In the video from Mia's phone, Ernesto does appear to go after Bustamante, who had at that time moved towards the ramp, but the other men who were with Bustamante also move in that direction and continue to try to separate Ernesto and Bustamante. A gun can then be seen in Bustamante's hand. The evidence of what happened from that moment until the next video is minimal. However, at least Stephanie testified that the fighting had stopped and that the two men had been separated. Sergio said that it appeared the fight was over, and also told a detective at the scene that it appeared that everyone was backing away from Bustamante before he fired.

In the video from Ashley's cell phone, it is apparent that there are several people, including two that appear to be helping Bustamante, between Bustamante and Ernesto. Although Bustamante is now sitting on the floor, it does not appear as though Ernesto was physically attacking Bustamante, or dangerously close to Bustamante, at the time that Bustamante fired the gun. Commander Hanley estimated that there was about nine feet, three inches between Bustamante and Ernesto.

Ernesto did not have any significant injuries to his hands. Detectives found a switchblade knife in his pocket but there was no testimony suggesting that Ernesto ever took the knife out or threatened Bustamante with it during the fight.

Bustamante and his two companions left the scene after the shooting, and before law enforcement arrived, raising inferences that he was not significantly injured from the fight, and that he may have had consciousness of guilt. The gun was never recovered. The next day Bustamante sent text messages indicating "some shit went down." He did not claim to have shot Ernesto in self-defense.

15

From the verdict we can infer that the jury believed Bustamante did not act with malice, but that he did unlawfully kill Ernesto. (See *Moye, supra,* 47 Cal.4th at p. 549.) That could be due to sudden quarrel, heat of passion, or unreasonable self-defense. (*Blakeley, supra,* 23 Cal.4th at pp. 89–91.) However, the jury did not believe that Bustamante acted in perfect self-defense, meaning that they concluded that he did not reasonably believe that he needed to use deadly force to defend himself from imminent death or great bodily injury. The jury could reasonably have concluded that Bustamante was the aggressor, as there was evidence that there was no conflict until Bustamante and the two other individuals at the table approached Ernesto as he was paying his check to leave. Or the jury could have reasonably concluded that the fight was breaking up and Bustamante was no longer in imminent danger when he shot Ernesto. These were fact questions for the jury and we cannot reweigh the evidence on appeal.

Based on the foregoing, we conclude that there was substantial evidence to support the voluntary manslaughter conviction. Bustamante's argument under the federal due process clause fails for the same reasons.

## B. Any Error in Instructing the Jury with CALCRIM Nos. 3471 and 3472 Was Harmless

Bustamante next contends that there was not sufficient evidence to support instructing the jury with CALCRIM No. 3471, regarding mutual combat, or CALCRIM No. 3472, regarding contrived self-defense. As we explain, there was evidence to support giving at least CALCRIM No. 3471, and to the extent that it was error to give either, the error was harmless.

The version of CALCRIM No. 3471 given to the jury states:

> "A person who engages in mutual combat or who starts a fight has a right to self-defense only if:

> 1. He actually and in good faith tried to stop fighting;

2. He indicated, by word or by conduct, to his opponent, in a way that a reasonable person would understand, that he wanted to stop fighting and that he had stopped fighting;

AND

3. He gave his opponent a chance to stop fighting.

If the defendant meets these requirements, he then had a right to self-defense if the opponent continued to fight.

A fight is mutual combat when it began or continued by mutual consent or agreement. That agreement may be expressly stated or implied and must occur before the claim to self-defense arose."

The version of CALCRIM No. 3472 given to the jury states:

"A person does not have the right to self-defense if he or she provokes a fight or quarrel with the intent to create an excuse to use force."

" 'In considering a claim of instructional error we must first ascertain what the relevant law provides, and then determine what meaning the instruction given conveys. The test is whether there is a reasonable likelihood that the jury understood the instruction in a manner that violated the defendant's rights. In making this determination we consider the specific language under challenge and, if necessary, the instructions as a whole.' " (*Lopez, supra,* 199 Cal.App.4th at p. 1305.)

Here, though, Bustamante does not assert that there was a legal error in the wording of either instruction. Rather, he asserts that the trial court should not have given either based on the evidence presented at trial. (See, *People v. Guiton* (1993) 4 Cal.4th 1116, 1129 (*Guiton*) ["It is error to give an instruction which, while correctly stating a principle of law, has no application to the facts of the case."].)

17

We review this type of error by determining only whether there was substantial evidence to support giving the instruction. (*People v. Ross* (2007) 155 Cal.App.4th 1033, 1049 ["A party is entitled to a requested instruction if it is supported by substantial evidence."].) "Evidence is '[s]ubstantial' for this purpose if it is 'sufficient to "deserve consideration by the jury," ' that is, evidence that a reasonable jury could find persuasive.' " (*Ibid.*) "[R]eversal is required if it is reasonably probable the result would have been more favorable to the defendant had the error not occurred." (*Guiton, supra,* 4 Cal.4th at p. 1130.) "If the inadequacy of proof is purely factual, of a kind the jury is fully equipped to detect, reversal is not required whenever a valid ground for the verdict remains, absent an affirmative indication in the record that the verdict actually did rest on the inadequate ground." (*Id.* at p. 1129.)

Bustamante raised this same issue at trial and argued that Joanna was the only witness who presented evidence supporting the instructions, and that "her story is in a world of lots of conflicting testimony." The trial court stated that it intended to give both instructions and explained:

> "At this point in the case, the Court is not determining credibility of witnesses. That's for the jury to determine. The question is whether or not there was evidence of your client provoking a fight along with his friends. And, as you said, [Joanna] has had a version of events that is, perhaps, inconsistent with any other witness, but she was quite committed to her thought process and articulated what she believed to be was evidence of a first-degree murder that was perpetrated by Mr. Bustamante."

As the trial court explained, the jury was entitled to believe Joanna's version of the events, even if her testimony conflicted with the testimony of the other witnesses. Moreover, Joanna was not the only witness that suggested Bustamante may have instigated the altercation. As we have explained, almost all the witnesses agreed that the initial conversation

18

between Ernesto, Bustamante, and the other men at the table was friendly and nonconfrontational. The fight only occurred after Bustamante and his two friends approached Ernesto as Ernesto was paying his bill to leave. Mia testified that Bustamante approached with a stack of brown paper, perhaps napkins, which he and Ernesto pushed back and forth, and that Ernesto went from jovial to upset during the exchange. This testimony would support an inference that Bustamante communicated something to Ernesto to start the fight, even if Bustamante did not throw the first punch. And, of course, much of this occurred *before* the video from Mia begins, such that the video itself does not establish whether it was Ernesto or Bustamante who first instigated the physical altercation.

In the video, Bustamante can be seen punching Ernesto, while Tony has Ernesto in a hold. Not long after, Bustamante is seen on the ramp with a gun in his hand. At that time, Ernesto is holding Bustamante in a headlock, but Bustamante is standing and does not appear to be injured. While it is difficult to see what occurs between Bustamante and Ernesto just before that, it would be reasonable for a fact finder to infer that Ernesto placed Bustamante in the headlock *because* he saw the gun, which Bustamante seems to have taken out sometime during the altercation, after Ernesto broke free from Tony and before Bustamante moved up towards the top of the ADA ramp. Moreover, whatever happened between Mia's video and Ashley's video, it would also be reasonable for a fact finder to infer that Bustamante had the gun in his hand the entire time, and that Ernesto was defending himself at that point.

As Bustamante appears to concede, the instructions regarding self-defense, including CALCRIM Nos. 3471 and 3472 were legally accurate. CALCRIM No. 3471 explains the circumstances under which a defendant

19

who "engages in mutual combat *or who starts a fight*" may nonetheless be entitled to claim self-defense. Here, there was at least some evidence from which a reasonable jury could infer that Bustamante either started the fight by attacking Ernesto (i.e., Joanna's testimony regarding how the fight started), or communicated an intent or agreement to fight, either via spoken words or the stack of papers that was passed back and forth. To the extent the jury determined that Bustamante either instigated or agreed to engage in the fight, CALCRIM No. 3471 simply informed them of the ways in which he could have subsequently withdrawn and therefore remained entitled to a claim of self-defense.[6]

The evidence to support giving CALCRIM No. 3472—"A person does not have the right to self-defense if he or she provokes a fight or quarrel *with the intent* to create an excuse to use force"—was more tenuous. Although, as we have just explained, there was at least some evidence supporting an inference that Bustamante provoked the fight, there is no direct evidence indicating that he did so with the intent to create an excuse to use force. At most, there is an inference that Bustamante somehow instigated the fight, and that he did so knowing that he had a gun in his possession.

Regardless, to the extent the trial court erred by instructing the jury with either CALCRIM No. 3471 or 3472, we would conclude that the error

---

[6]    Bustamante asserts that *People v. Quach* (2004) 116 Cal.App.4th 294 supports his position but it does not. Rather, in *Quach*, the court found that the mutual combat instruction that was given was legally incorrect. (See *id.* at p. 302 ["While it is not our province to decide whether these were the facts in this case, they were certainly the facts Quach argued, and we have searched in vain for anything in the instructions given in this case which would have helped the jury arrive at a verdict if they accepted that version of the facts. Indeed, CALJIC No. 5.56 would have seemed to most people rather clearly to reject a self-defense claim founded on that argument."].)

20

was harmless. "If CALCRIM No. [3471 or] 3472 was erroneously given because it was irrelevant under the facts, the error is merely technical and not grounds for reversal." (*People v. Eulian* (2016) 247 Cal.App.4th 1324, 1335; accord, *People v. Cross* (2008) 45 Cal.4th 58, 67 ["giving an irrelevant or inapplicable instruction is generally ' "only a technical error which does not constitute ground for reversal." ' "]; *People v. Rowland* (1992) 4 Cal.4th 238, 282 [same].) Reversal may be required if the record affirmatively indicates that the jury did rely on the unsupported ground in reaching its verdict, but there is no such indication here.

Bustamante points out that the prosecutor argued: "The defendant doesn't get to go up to Ernesto with a stack of napkins, spark a confrontation, knowing he has a gun in his waistband, to create an excuse to use force. That's the law." This was not an incorrect statement of the law. To the extent there was no evidence suggesting that Bustamante did have the intent to create an excuse to use force, the jury was entitled to ignore this argument, as well as the related instruction. Indeed, the trial court instructed the jury with CALCRIM No. 200, which stated, in relevant part, "Some of these instructions may not apply, depending on your findings about the facts of the case. Do not assume just because I give a particular instruction that I am suggesting anything about the facts." The prosecutor reiterated this during closing, stating further, "Some instructions might not apply, depending on your findings about the facts in this case." And defense counsel also argued that neither CALCRIM No. 3471 nor 3472 applied to the facts as demonstrated at trial.

In any event, as Bustamante points out, the prosecutor also argued that Bustamante shot Ernesto "in retaliation over a beatdown at a bar." And she went on to explain both perfect and imperfect self-defense, and to argue

21

that Ernesto never used, or threatened to use, any weapon and that it was Bustamante that "brought a gun to a fistfight," thereby using more force than was reasonably necessary. After hearing the evidence, the instructions, and the arguments, the jury found Bustamante guilty of voluntary manslaughter. That verdict suggests that they believed Bustamante acted in imperfect self-defense or that he was provoked and/or acting from passion rather than judgment. Given the evidence presented in this case, neither CALCRIM No. 3471 nor 3472 would impact the jury's verdict as to any of these theories.

Considering the record as a whole, we conclude that any error in instructing the jury with CALCRIM No. 3471 or 3472 was harmless. For the same reasons, giving the instructions did not violate Bustamante's federal constitutional rights.

## C. The Trial Court Did Not Abuse its Discretion by Denying Probation

Bustamante's final assertion is that the trial court abused its discretion by concluding that the case was not unusual for the purposes of granting probation.

Penal Code section 1203, subdivision (e)(2) provides:

> "Except in unusual cases in which the interests of justice would best be served if the person is granted probation, probation shall not be granted to any of the following persons:  [¶]  (2) Any person who used, or attempted to use, a deadly weapon upon a human being in connection with the perpetration of the crime of which that person has been convicted."

" 'The sentencing court has broad discretion to determine whether an eligible defendant is suitable for probation.' " (*People v. Nuno* (2018) 26 Cal.App.5th 43, 49 (*Nuno*).)  "There is likewise broad discretion to determine whether a given case is 'unusual' and entitles the defendant to probation in the interests of justice." (*Ibid*.)  "To establish abuse, the

22

defendant bears the burden on appeal to show that the denial of probation was, under the circumstances, arbitrary, capricious, or exceeding the bounds of reason." (*Ibid.*)

" 'Generally speaking, the trial court must state reasons for granting or denying probation.' " (*Nuno, supra,* 26 Cal.App.5th at p. 49.) "But it need not provide reasons for declining to find a case 'unusual' so as to rebut any presumptive ineligibility for probation. [Citation.] And it does not apply the criteria in rule 4.414 to determine whether to grant probation *unless* it first finds any statutory presumption against probation is rebutted." (*Ibid.*).

Here, the trial court reviewed and considered the probation report, the sentencing materials provided by counsel, and counsel's arguments. At the conclusion of argument, the court explained:

> "This is one of the few cases that this Court has ever presided over where honestly I have more questions than answers at the end of the trial. . . . We know that Ernesto threw the first punch and continued to attempt to attack Mr. Bustamante throughout the encounter. A question that has never been answered is why Ernesto threw that first punch. Was he, in fact, the person who was provoked?

> "The defendant, Mr. Bustamante, was the only person with a loaded firearm at [the restaurant] that night. The defendant and his group of friends stopped by the victim's table, presumably on their way out of the restaurant.

> "However, we know what Mr. Bustamante, was thinking because he wrote a letter to this Court . . . . The defendant says his only intent was to—and I'm quoting here—scare him off and stop him from attacking me.

> "But these are two very different types of intent. The intent to stop Ernesto from attacking him clearly goes to self-defense and imperfect self-defense. Our jury was given both of these defenses to consider.

> "What our jury was not instructed on was how to consider the defendant's intent to scare the victim off. That is a

23

different intent than fear of imminent death or great bodily injury. That statement tells this Court that Mr. Bustamante knew he had options. If his intent was to scare Ernesto, he could have shot in the air. He could have shot in the ground. He could have shot the gun near Ernesto. He didn't actually have to shoot Ernesto.

"[¶] . . . [¶]

"There is no question in this Court's mind that Mr. Bustamante knew he had options other than self-defense.

"Other questions left unanswered include why Mr. Bustamante was carrying apparently an unregistered and loaded firearm in the first place. . . . The Court understands that Mr. Bustamante has a documented history of mental health. Knowing that about himself, why is he carrying a loaded gun in a public place?

"Another unanswered question is where is the gun now? Mr. Bustamante was very detailed in his letter to the Court about what happened during the night of the incident and the following days but never once explained what he did with the gun. When considering a grant of probation, which the defendant is presumptively ineligible for, how could this Court ever conceivably overcome that presumption when the defendant is not honest about the weapon that was used to commit the crime that he was convicted of.

"There is objective evidence to support a claim of self-defense. There is equally objective evidence the defendant made a series of choices, through both words and conduct, that demonstrate to this Court that he had options besides shooting the victim.

"[¶] . . . [¶]

"After evaluating the factors listed in Rule of Court 4.413, subdivision (c), this Court is not persuaded that the presumption of ineligibility is overcome. For those reasons, probation is denied."

On the record before us, we have no trouble concluding that the trial court both understood and appropriately exercised its discretion. Bustamante focuses primarily on the trial court's discussion of his intent and its comment then he did not have to shoot Ernesto. But reading the trial court's entire explanation in context, it is apparent that was not the only factor the court considered. Rather, the court seemed more focused on the fact that Bustamante did not explain why he had a gun that evening or what happened to the gun after the shooting. For that reason, the trial court questioned Bustamante's honesty. Bustamante presents no argument or authority indicating this was not a valid consideration for the trial court.

In sum, we cannot conclude that the trial court abused its broad discretion to determine whether this was an unusual case in which Bustamante was entitled to probation despite the statutory presumption. (See, *Nuno, supra*, 26 Cal.App.5th at p. 49.)

## III.  DISPOSITION

The judgment is affirmed.

KELETY, J.

WE CONCUR:

DATO, Acting P. J.

CASTILLO, J.